UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

EMILIA KUENTZ, *et al.*,

    *Plaintiffs*,

v.

CACI INTERNATIONAL, INC., *et al.*,

    *Defendants*.

No. 24-cv-2496 (DLF)

**MEMORANDUM OPINION**

    Emilia Kuentz and Thomas Carpenter, on behalf of themselves and a putative class, bring this action for unpaid wages and penalties against CACI International, Inc.; CACI, Inc. – Federal; CACI, LLC – Commercial; and unnamed subsidiaries. Am. Compl. ¶¶ 1–12, Dkt. 13. The plaintiffs allege violations of the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201 *et seq.*, the District of Columbia Wage Payment Collection Law (DCWPCL), D.C. Code §§ 32-1301 *et seq.*, and the District of Columbia Minimum Wage Revision Act (DCMWA), D.C. Code §§ 32-1001 *et seq*. Am. Compl. ¶¶ 112–32, 133–46, 147–57. Before the Court is the defendants' motion to dismiss. Mot. to Dismiss, Dkt. 16. For the reasons that follow, the Court will grant that motion.

**I.    BACKGROUND**

    **A.    Plaintiffs' Employment**

    The defendants—CACI International, Inc.; CACI, Inc – Federal; and CACI, LLC – Commercial; and unnamed subsidiaries (collectively, CACI)—contract with government agencies to provide services. Since 2020, CACI has contracted with the U.S. Department of Justice to provide information technology and litigation support. Am. Compl. ¶ 46 & n.5. Pursuant to this

contract, called "Mega 5," *id.*, CACI employed Emilia Kuentz as a "General Clerk III" from about August 2022 to May 2024, *id* ¶ 38.  Kuentz's offer letter specified that she would receive $19.52 per hour with a fringe-benefit rate of $4.23.  Kuentz Offer at 2, Ex. A, Dkt. 19-1.  Neither Kuentz's offer nor CACI's general employment agreement referenced any obligation to pay increased wages and benefits.  *See id.* at 2–3; Gen. Emp. Agreement at 1–3, Ex. B, Dkt. 19-2.  CACI also employed Thomas Carpenter as a "General Clerk III" and a "Production Control Clerk" from about June 2021 through January 2023.  Am. Compl. ¶ 41.  Carpenter's signed employment agreement does not mention any obligation to pay increased wages or benefits.  Carpenter Emp. Agreement at 2–3, Ex. C, Dkt. 19-3.[1]  Both the general employment agreement and Carpenter's signed agreement contain integration clauses and no mention of subsequent wage determinations.  *See* Gen. Emp. Agreement at 2 ("This Agreement, together with the terms of [other documents] . . . [that] describe policies, obligations and/or restrictions applicable to me during the period of my employment, make up the complete agreement I have with CACI regarding my employment."); Carpenter Emp. Agreement at 2–3 (similar).

The plaintiffs allege that CACI did not update their "wage and cash in lieu of benefits rate" after the issuance of "new wage determinations by the Secretary of Labor."  Am. Compl. ¶¶ 62–65.  Those determinations, the plaintiffs say, increased the wages and fringe benefits owed to

---

[1] The Court may consider the plaintiffs' offer and employment contracts at this early stage because the plaintiffs incorporated them into their complaint by making allegations about "the understanding" under which they were hired and by referencing "their paystubs, onboarding documents, Defendants' Public Work contracts, Defendants' human resources information system, or other information maintained and controlled by Defendants."  Am. Compl. ¶¶ 60–61; *see Slovinec v. Georgetown Univ.*, 268 F. Supp. 3d 55, 59 (D.D.C. 2017) ("In ruling on a motion to dismiss, the Court may consider not only the facts alleged in the complaint, but also documents attached to or incorporated by reference in the complaint and documents attached to a motion to dismiss for which no party contests authenticity. . . . Moreover, a document need not be mentioned by name to be considered 'referred to' or 'incorporated by reference' into the complaint." (citation modified)), *aff'd*, No. 17-7122, 2018 WL 1052650 (D.C. Cir. Jan. 26, 2018).

employees of their classification under the Service Contract Act (SCA), 41 U.S.C. §§ 6701, *et seq.* *Id.* ¶¶ 62, 64. The plaintiffs further allege that CACI did not account for those wage-and-benefit increases when calculating their overtime premiums. *Id.* ¶ 77. And finally, the plaintiffs allege that CACI excluded cash paid in lieu of benefits from their "regular rate" for overtime purposes. *Id.* ¶ 70.

### B.      Procedural History

The plaintiffs filed the operative complaint in October 2024. *See* Am. Compl. They assert that the defendants' failure to implement wage-and-benefit increases following the Secretary of Labor's wage determinations deprived them of "payment of prevailing [regular] wages," in violation of the DCWPCL, D.C. Code § 32-1305(b). Am. Compl. ¶¶ 136–42. Because the defendants did not increase wages in line with subsequent wage determinations, the plaintiffs also claim that the defendants did not pay overtime premium compensation at the correct "regular rate," in violation of the FLSA, 29 U.S.C. § 207(a)(1), *id.* ¶¶ 116–19. Moreover, the plaintiffs assert that CACI improperly excluded cash paid in lieu of fringe benefits from their "regular rate," resulting in the underpayment of overtime premiums in violation of the FLSA, the DCWPCL, and the DCMWA, D.C. Code § 32-1003. *Id.* ¶¶ 124–28, 133–46, 149–55.

CACI has moved to dismiss for failure to state a claim. Mot. to Dismiss. First, CACI argues that the SCA forecloses the plaintiffs' wage-and-benefit increase claims. *Id.* at 15–19. Second, CACI argues that the plaintiffs' claims for overtime on cash paid in lieu of benefits fail because the SCA excludes such benefits from employees' "regular rate" for overtime purposes. *Id.* at 7–15.

## II.     LEGAL STANDARDS

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a defendant to move to dismiss an action for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  To survive a Rule 12(b)(6) motion, a complaint must contain factual matter sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A facially plausible claim is one that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Rule 12(b)(6) does not amount to a specific probability requirement, but it does require "more than a sheer possibility that a defendant has acted unlawfully." *Id.*; *see Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level."). The complaint need not make "detailed factual allegations," but allegations that are merely a "formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

Well-pleaded factual allegations are "entitled to [an] assumption of truth," *Iqbal*, 556 U.S. at 679, and the court construes the complaint "in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged," *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (citation modified).  The assumption of truth does not apply, however, to a "legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (citation modified).  An "unadorned, the-defendant-unlawfully-harmed-me accusation" is not credited; likewise, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*  Ultimately, "[d]etermining whether a complaint states a plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

4

### III.     ANALYSIS

#### A.     **Wage and Benefit Increases**

The SCA governs certain contracts made by the federal government with the "principal purpose" of "the furnishing of services in the United States through the use of service employees." 41 U.S.C. § 6702(a)(3). Covered service contracts must contain provisions for contractors to pay employees the "prevailing" wage for their classification and to provide certain fringe benefits. *See id.* § 6703(1)–(2). Those wage-and-benefit requirements are set by wage determinations made by the Secretary of Labor. *Id.* § 6703(5).

The SCA authorizes the "Secretary [of Labor] or the head of a Federal agency" to hold contractors "liable for an amount equal to the sum of any deduction, rebate, refund, or underpayment of compensation due any employee engaged in the performance of the contract." *Id.* § 6705(a), (d). Those funds may be recovered by withholding payment due on contracts, *id.* § 6705(b)(1), or by the federal government bringing "action against the contractor, subcontractor, or any sureties in any court of competent jurisdiction to recover the remaining amount of underpayment," *id.* § 6705(b)(2). In either event, the recovered amounts, on order of the Secretary, "shall be paid from the deposit fund directly to the underpaid employee." *Id.* § 6705(b)(1); *see id.* § 6705(b)(2). The Department of Labor's implementing regulations provide that employees may file confidential reports with the Wage and Hour Division about violations of the SCA or any rules prescribed thereunder. 29 C.F.R. § 4.191(a).

The plaintiffs allege that CACI failed to implement wage-and-benefit increases pursuant to wage determinations that followed their initial employment. Am. Compl. ¶ 65. The plaintiffs say that these determinations "would go into effect whenever [CACI's] underlying contracts for Public Work were extended according to an option on the contract or the anniversary of one of

their multiyear contracts elapsed," *id.* ¶ 63, and "[a]t that time, the new wage determination would act as an increase or raise to the required wage and cash in lieu of benefits rate," *id.* ¶ 64. The plaintiffs also allege that they were "hired with the understanding that they would be paid . . . in accordance with the Secretary of Labor's wage determinations." *Id.* ¶ 60. Thus, the plaintiffs claim, they were deprived of increased rates and benefits in violation of the DCWPCL. *Id.* ¶¶ 138–41.

The plaintiffs' claims turn on CACI's compliance with its Mega 5 contract.[2] But neither the SCA nor any other statute cited by the plaintiffs provides for employee enforcement of a federal agency's service agreements with its contractors. *See Danielsen v. Burnside–Ott Aviation Training Ctr., Inc.*, 941 F.2d 1220, 1228 (D.C. Cir. 1991) ("[B]y all authority and reason, it is plain that the SCA creates no private remedy."). Instead, the SCA empowers the "Secretary [of Labor] or the head of a Federal agency" to hold CACI "liable for . . . compensation due any employee engaged in the performance of the [Mega 5] contract." 41 U.S.C. § 6705(a), (d). And "disputes arising under the SCA must be resolved, in the first instance, by the statutory scheme for administrative relief set forth by Congress in the SCA and administered by the Department of Labor." *C&E Servs., Inc. of Wash. v. D.C. Water & Sewer Auth.*, 310 F.3d 197, 201 (D.C. Cir. 2002) (citation modified).

---

[2] The plaintiffs recognize that subsequent wage determinations would apply to their employment only upon modification of the Mega 5 contract. *See* Am. Compl. ¶¶ 50, 63–64. Nonetheless, the plaintiffs maintain that the determinations "would go into effect whenever [CACI's] underlying contracts for Public Work were extended according to an option on the contract or the anniversary of one of their multiyear contracts elapsed." *Id.* ¶ 63. But wage determinations do not automatically take effect; it is the contracting agency's duty to update multi-year contracts with subsequent wage determinations. *See* 29 C.F.R. § 4.145; *Prevailing Wage Resource Book, SCA Wage Determinations*, Dep't of Lab., https://perma.cc/DGG7-WTMV ("The contracting agency is required to incorporate the applicable wage determination(s) into the contract. Thus, only those wage determinations inserted into the contract at award, or by modification, are applicable.").

6

"To frame the action . . . in terms of [the DCWPCL] adds nothing," *Danielsen*, 941 F.2d at 1228, because the plaintiffs seek "an end-run around Congress's clear intent that the Department of Labor interpret and enforce the SCA in the first instance," *C&E Servs.*, 310 F.3d at 201. At bottom, the plaintiffs are suing for SCA-mandated rates on the theory that the SCA required CACI to update the Mega 5 contract with subsequent wage determinations. Am. Compl. ¶¶ 63–64. But it was the Department of Justice's duty to update the contract. *See supra* n.2. And even if CACI breached the Mega 5 contract, the SCA's remedial scheme empowers the "Secretary [of Labor] or the head of a Federal agency"—not private parties—to hold CACI liable and to collect on behalf of employees. *See* 41 U.S.C. § 6705(a), (d).

The plaintiffs argue that this case is like *Garcia v. Skanska USA Building, Inc.*, 324 F. Supp. 3d 76 (D.D.C. 2018). Pls.' Opp'n at 34, Dkt. 18. In *Garcia*, this Court held that the analogous Davis-Bacon Act did not foreclose a plaintiff's DCWPCL claim for wages owed under his contract with his employer. *Garcia*, 324 F. Supp. 3d at 84–85. As the Court explained, the *Garcia* plaintiff's claims "could be construed . . . to avoid the DBA entirely," and, in any event, the suit "would not require any classification or wage-setting decisions of the kind Congress has reserved for the Department of Labor." *Id.* at 84–85. But unlike *Garcia*, the plaintiffs' claims here hinge on the enforcement of a government-contractor service agreement rather than an employee's contract with their employer. The plaintiffs nevertheless insist that they simply seek the pay that the defendants "promised [them] . . . for [their] specific job classification[s]." Pls.' Opp'n at 34. And they allege that they "were hired with the understanding that they would be paid in line with their specific job category in accordance with the Secretary of Labor's wage determinations." Am. Compl. ¶ 60. The Court is left to presume that this "understanding" extended to subsequent determinations as well.

The plaintiffs' bald assertion about an "understanding" is contradicted by their employment agreements, which contain integration clauses and no mention of subsequent wage determinations. *See* Gen. Emp. Agreement at 2 ("This Agreement, together with the terms of [other documents] . . . [that] describe policies, obligations and/or restrictions applicable to me during the period of my employment, make up the complete agreement I have with CACI regarding my employment."); Carpenter Emp. Agreement at 2–3 (similar); *see also* Kuentz Offer at 2 (offering employment at $19.52 an hour). Because the plaintiffs do not plausibly allege a freestanding contractual entitlement to pay under new determinations as they are promulgated by the Secretary of Labor, *Garcia* offers no way around the SCA's scheme for government enforcement of the underlying service agreement. Accordingly, the Court will dismiss the plaintiffs' DCWPCL claims for unpaid wage increases and the plaintiffs' unpaid-overtime claims under the FLSA and the DCMWA to the extent that those claims turn on subsequent wage determinations.

### B.     Cash in Lieu of Benefits

The SCA requires contractors to provide employees with certain fringe benefits. In relevant part, the statute provides:

> A contract, and bid specification for a contract, to which this chapter applies under section 6702 of this title shall contain the following terms:
>
>   . . .
>
> (2) FRINGE BENEFITS.—The contract and bid specification shall contain a provision specifying the fringe benefits to be provided to each class of service employee engaged in the performance of the contract or any subcontract, as determined by the Secretary or the Secretary's authorized representative to be prevailing in the locality, or, where a collective-bargaining agreement covers the service employees, to be provided for under the agreement, including prospective fringe benefit increases provided for in the agreement as a result of arm's-length negotiations. The fringe benefits shall include medical or hospital care, pensions on retirement or death, compensation for injuries or illness resulting from occupational activity, or insurance to provide any of the foregoing, unemployment benefits, life insurance, disability and sickness insurance, accident insurance, vacation and holiday pay, costs of apprenticeship

> or other similar programs and other bona fide fringe benefits not otherwise required by Federal, State, or local law to be provided by the contractor or subcontractor. *The obligation under this paragraph may be discharged by furnishing any equivalent combinations of fringe benefits or by making equivalent or differential payments in cash under regulations established by the Secretary.*

41 U.S.C. § 6703(2) (emphasis added).

The plaintiffs do not contest that § 6703(2) of the SCA authorizes CACI to pay cash in lieu of furnishing fringe benefits. Yet they assert that the employer must pay overtime premiums on any "equivalent or differential payments in cash." Pls.' Opp'n at 4–5, 8.

If the SCA were silent about overtime pay, cash paid in lieu of some fringe benefits would be subject to overtime premiums. The FLSA uses the term "regular rate" to refer to an employee's baseline pay from which an employer must pay "a rate not less than one and one-half times the regular rate" when the workweek exceeds forty hours. 29 U.S.C. § 207(a)(1). And it defines "regular rate" "to include all remuneration for employment paid to, or on behalf of, the employee." *Id.* § 207(e). As relevant here,

> [T]he "regular rate" . . . shall not be deemed to include—
>
> . . .
>
> (2) payments made for occasional periods when no work is performed due to vacation, holiday, illness, failure of the employer to provide sufficient work, or other similar cause; reasonable payments for traveling expenses, or other expenses, incurred by an employee in the furtherance of his employer's interests and properly reimbursable by the employer; and other similar payments to an employee which are not made as compensation for his hours of employment;
>
> . . .
>
> (4) contributions irrevocably made by an employer to a trustee or third person pursuant to a bona fide plan for providing old-age, retirement, life, accident, or health insurance or similar benefits for employees.

*Id.* § 207(e)(2), (4). Under this definition, benefits such as holiday and sick pay, which are obviously paid in cash, are not subject to overtime premiums. But other fringe benefits for which

9

employees receive cash, such as cash payments for health insurance, are included in the "regular rate" because those cash contributions are not "irrevocably made by an employer to a trustee or third person." *Id.* § 207(e)(4).[3]

But the SCA speaks to the issue of fringe benefits in the calculation of overtime premiums. It provides:

> (e) EXCLUSION OF FRINGE BENEFIT PAYMENTS IN DETERMINING OVERTIME PAY.— In determining any overtime pay to which a service employee is entitled under Federal law, the regular or basic hourly rate of pay of the service employee does not include any fringe benefit payments computed under this chapter which are excluded from the definition of "regular rate" under section 7(e) of the Fair Labor Standards Act of 1938 (29 U.S.C. 207(e)).

41 U.S.C. § 6707(e).

Considered in the context of these statutory schemes, § 6707(e) of the SCA is susceptible to two interpretations. The first interpretation, which the plaintiffs advance, gives a "restrictive" reading to the final clause. On this view, § 6707(e) merely confirms the FLSA's rule: employers need not pay overtime premiums on "any fringe benefit payments computed under this chapter [that] are [already] excluded from the definition of 'regular rate' under section 7(e) of the Fair Labor Standards Act." *Id.*; *see, e.g.*, *Barnes v. Akal Sec., Inc.*, No. 04-cv-1350, 2005 WL 1459112, at *3–5 (D. Kan. June 20, 2005); *Bonner v. Metro. Sec. Servs., Inc.*, No. 10-CV-937, 2011 WL 902252, at *1–3 (W.D. Tex. Mar. 15, 2011); *Oliverio-Still v. AVMAC LLC,* No. 24-cv-0870, 2025 WL 674552, at *4–5 (S.D. Cal. Mar. 3, 2025).

---

[3] "The DCMWA largely mirrors the FLSA, but is more generous in its remedies for covered employees." *Garcia*, 324 F. Supp. 3d at 79. The DCWPCL does not speak to overtime pay but "requires employers to pay employees all wages earned on regular paydays, and defines 'wages' as 'all monetary compensation after lawful deductions, owed by an employer, whether the amount owed is determined on a time, task, piece, commission, or other basis of calculation.'" *Id.* (citation modified) (quoting D.C. Code § 32-1301(3)).

The second interpretation, embraced by the defendants, gives the final clause a "non-restrictive" meaning: "the regular or basic hourly rate of pay of the service employee does not include any fringe benefit payments computed under this chapter[,] which are excluded from the definition of 'regular rate' under section 7(e) of the Fair Labor Standards Act."  41 U.S.C. § 6707(e).  Under this reading, § 6707(e) excludes *all* fringe benefit payments calculated under the SCA—including those paid in cash under 41 U.S.C. § 6703(2)—from an employee's regular rate.  And the final, non-restrictive clause clarifies that all such benefits are categorically excluded from the FLSA's broader definition of "regular rate."  *See, e.g.*, *Phelps v. Parsons Tech. Support, Inc.*, No. 09-cv-0327, 2010 WL 4386920, at *1–2 (S.D. Ind. Oct. 29, 2010); 29 C.F.R. § 778.7.

The text and regulatory history of the SCA support the non-restrictive reading.

The Court starts, as always, with the text.  Excepting the final clause, the plain text of § 6707(e) is clear: "In determining any overtime pay to which a service employee is entitled under Federal law, the regular or basic hourly rate of pay of the service employee *does not include any fringe benefit payments computed under this chapter*."  41 U.S.C. § 6707(e) (emphasis added).  Under this statutory language alone, an employee's regular rate would not include any fringe benefit payments mandated by the SCA, including those paid in cash.  But the final clause follows that clear command with "[a]n unfastidious wording that used *which* without a comma."  Antonin Scalia & Bryan A. Garner, *Reading Law* 142 (2012) (Scalia & Garner).  In ordinary grammar, "*That* is better used to introduce a limiting or defining clause, *which* to introduce a nondefining or parenthetical clause."  Theodore M. Bernstein, *The Careful Writer* 444 (1965) (quoted in Scalia & Garner at 142 n.7).  But "[t]his grammatical convention—preferring *that* for restrictive clauses and comma-*which* for nonrestrictive ones—is unfortunately a weak basis for deciding statutory meaning" because Congress does not always follow the rule.  Scalia & Garner at 142; *see also,*

11

*e.g.*, *Barnhart v. Thomas*, 540 U.S. 20, 23–25 (2003). Because the Court does not "review congressional enactments as a panel of grammarians," *Flora v. United States*, 362 U.S. 145, 150 (1960), it looks to the rest of the provision's text for meaning.

Section 6707(e)'s use of the expansive phrase "any fringe benefit payments" supports the non-restrictive reading. "Congress' use of the word 'any' suggests an intent to use that term expansively." *Smith v. Berryhill*, 587 U.S. 471, 479 (2019) (citation modified); *see United States v. Gonzales*, 520 U.S. 1, 5 (1997) ("Read naturally, the word 'any' has an expansive meaning, that is, one or some indiscriminately of whatever kind." (citation modified)). The Court understands Congress to have used the natural meaning of "any" to capture whatever kind of fringe benefit payments are calculated under the SCA. It would defy this natural reading, therefore, for Congress to sweep in *all* fringe benefits under § 6703(2)—including the option to pay benefits in cash—only to narrow the universe of excludable fringe benefits under § 6707(e)'s final clause to those that were already exempt under the FLSA.

The "cardinal rule" against superfluity—which says, "if possible, effect shall be given to every clause and part of a statute," *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (citation modified)—lends further support for the non-restrictive reading. "This principle . . . applies to interpreting any two provisions in the U.S. Code, even when Congress enacted the provisions at different times." *Bilski v. Kappos*, 561 U.S. 593, 608 (2010). Section 6707(e), which excludes "any fringe benefit payments computed" under the SCA from an employee's "regular or basic hourly rate of pay," 41 U.S.C. § 6707(e), does more than simply re-codify the FLSA's existing regular-rate definition. Its final clause clarifies that any such fringe benefits are excluded from the FLSA's broader definition of "regular rate" under 29 U.S.C. § 207(e). Such clarification is necessary because other statutes specifically incorporate § 207(e)

12

to define "regular rate," including the DCMWA at issue here. *See* D.C. Code § 32-1002(7). As such, it is no surprise that Congress wanted to make clear that the SCA's regular-rate proviso is not swallowed by the FLSA's longstanding definition of "regular rate." The non-restrictive interpretation thus gives effect "to every clause and part" of the SCA. *RadLAX*, 566 U.S. at 645 (citation modified).

In contrast, adopting the restrictive view of § 6707(e) would create superfluity. Under the restrictive interpretation, "any fringe benefit payments computed under" the SCA would be excluded from an employee's regular rate—but only if the benefit was already excluded under § 207(e) of the FLSA. Such a reading would render Congress's enactment of the SCA provision "meaningless." *Pulsifer v. United States*, 601 U.S. 124, 142 (2024). "Remove [§ 6707(e)] from the statute, and what is left will make the exact same [fringe benefits] eligible (and ineligible) for [overtime pay]." *Id.*[4] Such superfluity is particularly difficult to overcome in this context because "the canon against surplusage applies with special force" when, as here, an interpretation would "render[] an entire subparagraph meaningless." *Id.* at 143 (citation modified).

Contemporaneous and consistent Department of Labor regulations provide further support for the non-restrictive interpretation of § 6707(e). In an interpretive rule promulgated in 1968—three years after the SCA's enactment—the Department of Labor explained that:

> If the employer furnishes equivalent benefits or makes cash payments, or both, to an employee as therein authorized, the amounts thereof, to the extent that they operate to discharge the employer's obligation under the McNamara-O'Hara Act

---

[4] In addition to rendering § 6707(e) superfluous, adopting a restrictive reading would gut the SCA's cash-in-lieu-of-benefits allowance. The SCA provides that an employer's fringe-benefit obligations "may be discharged by furnishing any equivalent combinations of fringe benefits or by making equivalent or differential payments in cash under regulations established by the Secretary." 41 U.S.C. § 6703(2). But the restrictive interpretation of § 6707(e) would penalize employers for exercising this option by subjecting cash payments to overtime premiums. Put another way, some employees would enjoy an overtime windfall merely because they elected to receive benefits in cash. Nothing in the SCA supports this odd result.

13

> to furnish such specified fringe benefits, may be excluded pursuant to such Act from the employee's regular or basic rate of pay in computing any overtime pay due the employee under the Fair Labor Standards Act, pursuant to the rule provided in § 4.55 of this title. *This means that such equivalent fringe benefits or cash payments which are authorized under the McNamara-O'Hara Act to be provided in lieu of the fringe benefits* specified in determinations issued under such Act are excludable from the regular rate in applying the overtime provisions of the Fair Labor Standards Act if the fringe benefits specified under the *McNamara-O'Hara Act would be so excludable if actually furnished*. This is true regardless of whether the equivalent benefits or payments themselves meet the requirements of section 7(e) of the Fair Labor Standards Act and Subpart C of this part 778.

29 C.F.R. § 778.7, 33 Fed. Reg. 986, 988 (Jan. 26, 1968) (emphasis added). The Department of Labor has maintained this interpretation of the CSA across implementing regulations that remain in force today. *See, e.g.*, 29 C.F.R. § 778.214(e), 33 Fed. Reg. 986, 996 (Jan. 26, 1968); 29 C.F.R. § 4.177(e), 48 Fed. Reg. 49762, 49798 (Oct. 27, 1983).

Although the Court does not defer to the Department of Labor's reading of § 6707(e), "interpretations issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024). Such executive judgments are particularly helpful when the "interpretations and opinions" were "made in pursuance of official duty" and "based upon . . . specialized experience." *Skidmore v. Swift & Co.*, 323 U.S. 134, 139–40 (1944); *Loper Bright*, 603 U.S. at 394 ("Such interpretations 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'" (quoting *Skidmore*, 323 U.S. at 140)). Here, the Department of Labor has promulgated contemporaneous and consistent regulations about § 6707(e), a provision of a labor statute for which the agency assumes primary administration and enforcement responsibilities. The Department's longstanding interpretation thus confirms that § 6707(e) means what it says: "any fringe benefit payments computed under" the SCA are excluded from an employee's overtime rate.

14

The plaintiffs' contrary caselaw is unconvincing.  First, *Barnes v. Akal Security, Inc.*, 2005 WL 1459112, at *3–5, embraced the restrictive reading without considering its superfluity problems and relied on dubious legislative history, *see id.* at *4.  Second, *Bonner v. Metropolitan Security Services, Inc.*, 2011 WL 902252, at *1–3, similarly ignored the rule against superfluity and applied a rule that "[e]xemptions from or exceptions to the FLSA's requirements are to be narrowly construed against the employer asserting them," *id.* at *3 (citation modified).  The Supreme Court has since "reject[ed] this principle as a useful guidepost for interpreting the FLSA." *Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 88 (2018).  Third, *Oliverio-Still v. AVMAC LLC*, 2025 WL 674552, at *4–5, summarily adopted the restrictive interpretation "[o]n the plain terms of the SCA" without considering superfluity and rejected the Department of Labor's longstanding regulations for want of "ambigu[ity]" in the statute, *id.* at *5.  Fourth, *Williams v. Enterprise Resource Planning International, LLC*, No. 25-cv-234, 2025 WL 1784628, at *1–2 (S.D. Cal. June 26, 2025), similarly concluded that "Section 6707(e) simply incorporates Section 207(e)'s exceptions" without acknowledging the rule against superfluity, *id.* at *2.  The Court thus sees no reason to follow these non-binding, out-of-circuit decisions by other district courts.

As a last resort, the plaintiffs invoke stray comments from a congressional hearing to resist the non-restrictive reading.  *See* Pls.' Opp'n at 10–13.  But "legislative history is not the law." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 523 (2018).  And the plaintiffs' evidence is particularly weak because "excerpts from committee hearings are among the least illuminating forms of legislative history." *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 437 (2019) (citation modified).

Both the plain text and longstanding regulatory history of the SCA support a non-restrictive reading of § 6707(e)'s final clause.  Accordingly, the Court will dismiss the plaintiffs' FLSA,

DCMWA, and DCWPCL claims for overtime premiums on cash paid in lieu of fringe benefits under the SCA.

## CONCLUSION

For the foregoing reasons, the defendants' Motion to Dismiss, Dkt. 16, is granted without prejudice. A separate order consistent with this decision accompanies this memorandum opinion.

September 30, 2025

DABNEY L. FRIEDRICH
United States District Judge